THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* TROY V. MARTIN, Defendant-Appellant.

First District (1st Division)   No. 78-1755

Opinion filed May 12, 1980.

Ralph Ruebner and Rafael Schwimmer, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Mary Ellen Dienes, and Richard F. Burke, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Troy V. Martin, was charged by way of an information with murder, attempt murder and aggravated battery. After a jury trial, he was convicted of murder and aggravated battery, but was acquitted of attempt murder. The trial court imposed concurrent sentences of 25 to 50 years for murder and 3 to 10 years for aggravated battery. A previous trial of this cause had ended in a mistrial because of a hung jury.

Defendant appeals, contending that (1) the trial court abused its discretion when it granted the jury's request, after deliberations had begun, for the transcript of the testimony of Eric Williams, a witness at the previous trial, and (2) the stipulation explaining Williams' unavailability to the jury denied defendant a fair trial.

Richard Schneider testified that at about 12:20 a.m. on November 14, 1976, he was in his car stopped at a red light at the intersection of LaVergne and Jackson Streets when a young man stumbled to his car and fell across the hood. Schneider helped the man into the car and, after noticing blood on the front of the man's coat, drove him to Loretto Hospital. Schneider identified two photographs of Charles McGee, the deceased, as the man he had driven to the hospital.

Beatrice Davis testified that she was the mother of 15-year-old Charles McGee, and that in November of 1976 she lived at 4833 West Adams with her husband, her children and 17-year-old Eric Williams. About 10:35 p.m. on November 13, 1976, her son Charles and Eric left their home to collect $2 a woman owed Eric. Charles was wearing a brown hat, which Davis identified. Shortly after midnight Eric returned home crying. After talking to Eric, Davis went to Quincy and LaVergne Streets, where a police officer told her that her son was at Loretto Hospital. When Davis arrived at the hospital, she was told that Charles was dead. She subsequently identified her son's body at the Cook County Morgue on November 15, 1976.

The prosecution and defense counsel stipulated that Eric Williams died on April 19, 1977, "as a result of a bullet fired from a gun" and that at the time he was shot Eric "was not in violation of any city, state or local law." The trial judge informed the jury that before his death Eric had testified at a prior proceeding and explained that a transcript of his testimony would be read to them by having the prosecution ask the questions which had been asked of Eric on direct examination and having Eric's responses read by an assistant State's attorney who was not involved in these proceedings. The testimony so read was edited so as not

to contain any objections or rulings made by the trial court at the previous trial.

In the transcript of Eric's prior testimony, which was stipulated to be true and accurate, he testified that on November 13, 1976, he lived with Beatrice Davis and her family, including Charles McGee. Eric and Charles were at home from 2:30 p.m. until about 10:45 p.m., at which time they left their house and walked to 4949 West Quincy to collect $2 owed Eric from a Miss Cook. As they returned to the front of their house, defendant, John Linzie, Michael Sims and a man Eric knew only as Tim arrived in a car driven by Tim. Defendant, John Linzie and Michael Sims got out of the car and Tim drove away. Defendant said that he had been told by Frankie Howard that Eric and Charles had burglarized defendant's house. Eric and Charles denied this and agreed to defendant's suggestion that they all walk over to Howard's home to straighten out the matter. On their way, they passed defendant's home. Defendant suggested that they all go upstairs to examine the broken lock on the door of defendant's third-floor apartment. Once upstairs, Eric observed that defendant's front door lock was broken. He and Charles stepped inside the apartment and stood in the front room. Charles stood beside Linzie and Sims near the kitchen doorway, while Eric stood in the middle of the living room. Defendant's wife, Jennifer Martin, was also present. Defendant went into the kitchen and returned with a long silver knife. Defendant ran toward Eric trying to stab him in the chest, and, after a scuffle, defendant stabbed Eric in the back. As Eric got up to run out the front door, he saw defendant stab Charles in the chest several times. Eric ran home and spoke with Davis, who called the police. Eric returned to defendant's apartment with two police officers, but found only John Linzie and Jennifer Martin. He then proceeded to Loretto Hospital, where he identified Charles' body and had his own wound treated. Eric denied that he or Charles had burglarized defendant's apartment. Eric identified defendant as well as photographs of defendant's living room and Charles' body. He also identified the brown hat worn by Charles at the time Charles was stabbed. On cross-examination, Eric disclosed that in 1975 he had pleaded guilty to robbery.

John Linzie testified for the defense that he was 19 years of age, that he had been a friend of defendant 7 or 8 years and that he was a cousin of defendant's wife. On November 13, 1976, he was with defendant and Michael Sims in a car driven by another young man when they spotted Charles McGee and Eric Williams walking down the street. Defendant asked Eric why he had broken into defendant's apartment. After Eric denied the accusation, the group started walking to Frankie Howard's house to confirm Frankie's allegation that Eric and Charles were the burglars. On the way, the group stopped at defendant's house, where Eric

and defendant started arguing and subsequently fighting and wrestling until Eric ran out of the apartment. Linzie testified further that Charles suggested they go to Frankie's house and Charles, defendant, Sims and Linzie all started walking down the stairwell. However, Linzie returned to the apartment when the defendant ordered him to stay with defendant's wife. Linzie testified that he never saw a knife in defendant's hands and never saw defendant stab Charles McGee. Linzie admitted giving the police a signed statement, but denied that he told the police that he had seen defendant stab both Eric and Charles.

Jennifer Martin testified that she was the 19-year-old wife of defendant, and that on November 13, 1976, she lived with him at 244 South LaVergne. She and defendant arrived home at about 10 p.m., to find their front door open. As they entered their apartment, they heard the back door slam. After discovering that a blanket, a stereo set and speakers were missing, the defendant left the apartment. He returned later with John Linzie, Michael Sims, Charles McGee and Eric Williams. Eric and defendant argued over who had taken defendant's stereo and they eventually began wrestling until Eric jumped up and ran from the apartment. Defendant then asked Charles who had his stereo. Defendant's wife testified that Charles suggested they go to Frankie's house and the group left the apartment, but that John Linzie returned to stay with her. Jennifer Martin testified that at no time did she see her husband with a knife in his hands.

Investigator Michael Miller of the Chicago Police Department testified on rebuttal that on November 14, 1976, he interviewed John Linzie in the police station at about 4:45 a.m. Linzie signed a typed statement in which he stated that he saw defendant stab both Eric and Charles and then throw the knife in the garbage because it had broken.

During deliberations, the jury requested a copy of the transcript of Eric Williams' testimony, the signed statement of John Linzie and another photograph of decedent. The trial judge denied the jury's request for John Linzie's statement, but allowed them to receive the photograph as well as the copy of Eric Williams' testimony taken at the first trial.

The jury returned a verdict of guilty of the murder of Charles McGee, guilty of aggravated battery of Eric Williams and not guilty of attempt murder of Eric Williams. Defendant's motion for a new trial was denied. Following a hearing in aggravation and mitigation, defendant was sentenced to concurrent terms of 25 to 50 years for murder and 3 to 10 years for aggravated battery.

Defendant first contends that the trial court abused its discretion when it granted the jury's request for the transcript of the testimony of Eric Williams after deliberations had begun. We find defendant's contention is without merit.

It is within the discretion of the trial court to allow or refuse a jury's request for the review of testimony. (*People v. Pierce* (1974), 56 Ill. 2d 361, 308 N.E.2d 577.) The existence of this discretionary power imposes a duty on the trial court to determine whether a review of the requested testimony would be helpful or harmful to the jury's proper deliberations. (*People v. McClellan* (1979), 71 Ill. App. 3d 611, 390 N.E.2d 131; *People v. Bell* (1976), 44 Ill. App. 3d 185, 357 N.E.2d 1256.) Because it is the jury itself requesting to review the testimony, the trial court must start with the assumption that the jury feels that such a review would be helpful. (*People v. McClellan; People v. Bell.*) The court must then determine if there is a possible basis for the jury's belief that a review of the testimony would be beneficial and what harm the proposed review might have on the jury's deliberations. *People v. McClellan; People v. Bell.*

In the case at bar, a review of Williams' testimony could aid the jury in determining the credibility and weight to be given his account of the incident. Because Williams was unavailable to testify and the jury was thus unable to view his demeanor, it is apparent that the jury would benefit from a review of that testimony and that the risk of harm would be minuscule, if it existed at all. It cannot be said that any portion of the testimony was given undue emphasis because the jury was provided with the entire transcript of Williams' testimony, including direct as well as cross-examination.

■■ We find that the trial court did not abuse its discretion in allowing the jury to review the transcript of Williams' testimony during its deliberations.

Defendant's second contention is that he was denied a fair trial because the unavailability of Williams was explained to the jury by informing them that Williams died "as a result of a bullet fired from a gun," and that at the time of his death Williams "was not in violation of any city, state or local law." Defendant contends that such evidence prejudiced defendant in that it may have created the unwarranted inference that defendant killed Williams because Williams had previously testified against defendant. We find that defendant was not prejudiced.

■■ The hearsay rule does not bar admission of prior recorded testimony from a former trial of the same action when the witness is unavailable because he or she has died and was subject to cross-examination at the prior proceeding. (*People v. Jackson* (1968), 41 Ill. 2d 102, 242 N.E.2d 145; *People v. Hoover* (1976), 35 Ill. App. 3d 799, 342 N.E.2d 795; see also *People v. Knippenberg* (1979), 70 Ill. App. 3d 496, 388 N.E.2d 806.) The prosecutor and defense counsel entered into a stipulation which explained Williams' unavailability to the jury. The portion of the stipulation stating that Williams had died "as a result of a bullet fired from a gun" was the exact language which appeared on Williams' death certificate. In addition, the record shows that defendant was in jail when Williams was

killed and the State introduced no evidence which in any way inferred that defendant was responsible for Williams' death. Moreover, the court allowed the stipulation to refer to the fact that Williams had not been in violation of the law at the time of his death. This was necessary because a prior conviction of Williams had been introduced at the first trial during Williams' testimony and the trial judge wanted to prevent any implication that Williams may have been killed while committing a crime. Further, even if we assume that error was committed regarding the proof of Williams' unavailability, such error was at worst harmless. See *People v. Howard* (1975), 34 Ill. App. 3d 145, 340 N.E.2d 53, and *People v. Hoover* (1976), 35 Ill. App. 3d 799, 342 N.E.2d 795.

■■ We find that the stipulated explanation of Williams' death was proper proof of Williams' unavailability as a witness and that defendant suffered no prejudice because of the explanation.

The judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

McGLOON and CAMPBELL, JJ., concur.